UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 19-80030-CR-DIMITROULEAS/MATTHEWMAN

UNITED STATES OF AMERICA,
        Plaintiff,

v.

PHILLIP BRAUN,
AARON SINGERMAN,
ANTHONY VENTRELLA,
JAMES BOCCUZZI,
DAVID WINSAUER,
BLACKSTONE LABS, LLC,
VENTECH LABS, LLC
        Defendants.
_____/

## DEFENDANTS' REDACTED FIRST MOTION TO DISMISS COUNTS 1, 4, 5, 6, 7, AND 8 AND INCORPORATED MEMORANDUM OF LAW AND REQUEST FOR ORAL ARGUMENT

**Introduction**

Defendants Phillip Braun, a/k/a "PJ", Aaron Singerman, Robert Dimaggio, Anthony Ventrella, a/k/a "Joey", James Boccuzzi, David Winsauer, Blackstone Labs, LLC (Blackstone) and Ventech Labs, LLC (Ventech) were indicted on March 7, 2019 and charged variously with numerous offenses relating to "Designer Steroids" and "Controlled Substances". This Motion To Dismiss addresses Counts 1, 4, 5, 6, 7, and 8 of the pending Indictment only.

Count 1 charges all defendants with a conspiracy to impair, impede, obstruct and defeat the lawful functions of the United States Food and Drug Administration using various deceitful and dishonest means. One of the substances charged in Count 1 is dimethazine.

Count 4 charges Braun, Singerman, Ventella, Boccuzzi, Winsauer, Blackstone and Ventech

with conspiracy to manufacture and distribute certain "controlled substances" referred to in the Indictment as "anabolic steroids." The government alleges in Count 4 that the defendants conspired to manufacture with intent to distribute trendione, halodrol, epistane, methylstenbolone, dimethazine and methyl-1-etiocholenolol. It is further alleged in Count 4 that an individual identified as C.H. suffered "serious bodily injury" from the use of the methyl-1-etiocholenolol. The government alleges in Count 4 that a "detectible amount" of the charged substances was present.

Count 5 alleges the distribution of dimethazine and methylstenbolone. It is alleged in Count 5 that a "detectible amount" of these substances was detected in the mixture distributed.

Count 6 charges Braun, Ventrella, Boccuzzi, Winsauer, Blackstone, and Ventech with the distribution of dimethazine and methylstenbolone. It is alleged in Count 6 that a "detectable amount" of these substances was detected in the mixture distributed.

Count 7 charges Braun and Blackstone with distribution of dimethazine. It is alleged in Count 7 that a "detectable amount" of this substance was detected in the mixture distributed.

Count 8 charges Ventrella and Ventech with possession with the intent to distribute dimethazine. It is alleged in Count 8 that a "detectable amount" of this substance was detected in the mixture seized.

Counts 1, 4, 5, 6, 7, and 8 allege that dimethazine, methylstenbolone and methyl-1-etiocholenolol are Schedule III controlled substances.

## I        Summary of Motion

Count 1 of the Indictment alleges a conspiracy to illegally sell a product referred to as Super DMZ RX 2.0. This product is alleged to contain the ingredient dimethazine. Dimethazine is not illegal under the United States Code and was not a scheduled drug during the time periods alleged

in Count 1. Accordingly Count 1 should be dismissed or the language regarding dimethazine contained in paragraph 11a of Count 1 should be stricken from the Indictment.

Count 4 of the Indictment alleges a conspiracy to distribute controlled substances known as designer steroids. As to three of these six "designer steroids", dimethazine, methylstenbolone and methyl-1-etiocholenolol, Count 4 must be dismissed or the Court should strike them from the Indictment as they are not crimes existing under the United States Criminal Code. These three substances are not "scheduled" nor have they ever been. As to Count 4 no challenge is being made in this motion to the other three substances, trendione, halodrol and epistane.

Count 5 of this Indictment must likewise be dismissed as it alleges that the charged defendants distributed 60,000 capsules containing a mixture of a "detectible amount" of dimethazine and methylstenbolone as set forth above, these two (2) substances are not illegal nor scheduled controlled substances and therefore cannot form the basis of a criminal charge. Accordingly Count 5 should be dismissed.

Count 6 of this Indictment must also be dismissed as it alleges that the charged defendants distributed 30,000 capsules of a mixture containing a "detectable amount" of dimethazine and methylstenbolone, as set forth above, these two (2) substances are not illegal nor scheduled controlled substances and therefore they cannot form the basis of a criminal charge. Accordingly Count 6 should be dismissed.

Counts 7 and 8 of this Indictment must also be dismissed as it alleges that the charged defendants possessed with the intent to distribute and that the charged defendants did distribute a mixture containing a "detectable amount" of dimethazine, as set forth above, this substance is not illegal nor is it a controlled substance and therefore it cannot form the basis of a criminal charge.

Accordingly Counts 7 and 8 should be dismissed.

**II       Relevant Statutory History of Criminal Regulation of Anabolic Steroids**

The first federal act criminally regulating steroids became effective on February 27, 1991 (the 1990 Act). The 1990 Act established and sought to regulate anabolic steroids as a Schedule III Class of drugs under the Controlled Substances Act (CSA). The 1990 Act added twenty-five known anabolic steroids to the CSA.

On October 22, 2004, the Anabolic Steroid Control Act of 2004 was signed into law (the 2004 Act). The 2004 Act modified the procedure set forth in 21 U.S.C. 811 by providing that a steroid could now be classified and listed through the rule making process.[1] The 2004 Act increased the number of proscribed anabolic steroids to fifty-nine. The 2004 Act classified drugs as anabolic steroids if the following four criteria were met:   (1) the substance is chemically related to testosterone, (2) the substance is pharmacologically related to testosterone, (3) the substance is not an estrogen, progestin or a corticosteroid, and (4) the substance is not dehydroespiandrosterone (DHEA). *Id.*  Pursuant to the 2004 Act, drugs could be scheduled as anabolic steroids if they met the criteria set forth in the Act. The 1990 Act had laid the foundation for scheduling anabolic steroids. The 2004 Act built upon this foundation by providing a rule making procedure which enabled the Drug Enforcement Administration (DEA) to add anabolic steroids to Schedule III if they met certain very specific criteria. The law was very clear on how the DEA rule making authority must be used. If the DEA intended to add an anabolic steroid to Schedule III a Notice of Proposed Rule Making would have to follow a strict protocol including publication of a notice in the Federal Register. The notice would have to include the DEA analysis of the drug to be scheduled and detail

---

[1]Anabolic Steroid Control Act of 2004, Pub. L. No. 108-358, 118 Stat. 1661.

how the substance met the 2004 definition of an anabolic steroid under the guidelines of the 2004 Act. The process was time consuming. The process of adding three anabolic steroids to the list of Schedule III drugs took as long as twenty months, despite the fact that the DEA had evidence to justify scheduling the substances when the application was made and notice was filed. *Id.*

A Notice was filed by the DEA on November 23, 2011 which sought to schedule two additional substances as anabolic steroids: Prostanozol and Methasterone. As with the 2008 proposal, the DEA sought to schedule two substances which met the definition of an anabolic steroid under the 2004 Act. Not withstanding this, a final rule scheduling these two substances as anabolic steroids was not issued until July 30, 2012 or approximately eight months after the notice was filed. The Supreme Court recognized the length of time it took to add a substance to the schedule in *Touby v. United States* 500 U.S. 160 (1991) when it stated in discussing the scheduling requirements of a different controlled substance: "[i]t takes time to comply with these procedural requirements. From the time when law enforcement officials identify a dangerous new drug, it typically takes 6-12 months to add it to one of the schedules. Drug traffickers were able to take advantage of this time gap by designing drugs that were similar in pharmacological effect to scheduled substances but differing slightly in chemical composition, so that existing schedules did not apply to them". *Id. at 163.*

The frustration of the DEA was evident when, during a hearing before the Senate Subcommittee on Crime and Drugs on September 29, 2009 the DEA Assistant Administrator from the Office of Diversion Control, Mr. Joseph T. Rannazzisi, stated to the committee that, "Although a compound may be an anabolic steroid, it still must go through the scheduling process in order to become a Schedule III controlled substance." Body Building Products and Hidden Steroids:

5

Enforcement Barriers H.R. 570, 111th Cong. (2009). Mr. Rannazzisi's testimony continued:

> Now, let me turn to you Mr. Rannazzisi. You have Super Draw (sic) which was on the market which Mr. Jareem Gunter used. In the affidavit issued by your agency says that Super Draw (sic) is a synthetic anabolic steroid. But yet Super Draw (sic) is not listed on schedule III as a prohibited anabolic steroid; why not?
>
> **Mr. Rannazzisi**. It is one of the substances that we are looking at.
>
> **Chairman Specter**. What?
> **Mr. Rannazzisi**. It is one of the substances that we are looking at. It is out on the market. It is not----
>
> **Chairman Specter.** Wait a minute, what are you looking at? You've got the affidavit which your agency filed, what more is there to look at?
>
> **Mr. Rannazzisi**. It still has to go through the scheduling process, sir. It still has to go through the scheduling process.
>
> **Chairman Specter**. Wait a minute. You took an affidavit that it was an anabolic steroid.
>
> **Mr. Rannazzisi**. Yeah.
>
> **Chairman Specter.** When you say something that is false in an affidavit filing we may find a criminal case here, but in the wrong direction. But when you have identified Super Draw (sic) as an anabolic steroid and you have a case of a young man who has been hurt, is there any conceivable excuse for your agency not having listed it on schedule III?
>
> **Mr. Rannazzisi.** Sir, I can't just list something on schedule III. It still has to go through the scheduling process. It must go through the scheduling process. I don't have the authority just to say, I want this drug scheduled. There's a process through the Administrative Procedures Act----
>
> **Chairman Specter**. You can take an affidavit that it's an anabolic steroid but not put it on schedule III? Would you like us to change the law to simply (sic) the scheduling process?
>
> **Mr. Tygart**. We would, Senator. *Id.*

This highlights the point that the process of getting anabolic steroids scheduled was

complicated and took a long time.

In response to these comments, the Chairman asked the Deputy Assistant Administrator if he would like the law changed to simplify the process.  *Id.* at 27.

**III      The Designer Anabolic Steroid Control Act of 2014 (DASCA)**

The frustration of twenty-four years of anabolic steroid legislation that had not proven to be effective in controlling the flow of anabolic steroids to the general public, resulted in the proposed legislation of the Designer Anabolic Steroid Control Act (DASCA) in 2010. Although the term "designer" steroids was not defined in the Act, it had been clear for years that chemists could slightly modify substances which had been previously controlled and scheduled and thereby evade the reach of the criminal laws. As set forth above, this had long been a frustration of the DEA, the Federal Drug Administration (FDA) and the Department of Justice (DOJ). This Act proposed to solve this problem by authorizing the attorney general to temporarily schedule any anabolic steroid which met the definition set forth in the statute, a process which would only take thirty days. The proposed Act further provided that the temporary scheduling could last for as long as two years with one six month additional extension. Thereby giving the DEA and the FDA the ability to fully investigate the temporarily scheduled drug to confirm it met all of the statutory requirements. So, in other words, the drug would become illegal after thirty days, for up to thirty months, during which time a final determination would be made.

DASCA provided a new definition of anabolic steroids. 21 U.S.C. § 802(41) (A). The Act provided that:

> "a drug or hormonal substance (other than estrogens, progestins, corticosteroids and dehdroepiandrosterone) that is not listed in sub paragraph (A) of the Act and is derived from, or has a chemical structure substantially

7

similar to one or more anabolic steroids listed in sub paragraph (A) shall be considered an anabolic steroid for the purpose of this Act if:

> (I)     The drug or substance has been created or manufactured with the intent of producing a drug or other substance that either - (aa) promotes muscle growth; or (bb) otherwise causes a pharmacological effect similar to that of testosterone;
>
> (II)    the drug or substance has been, or is intended to be, marketed or otherwise promoted in any manner suggesting that consuming it will promote muscle growth or any other pharmacological effect similar to that of testosterone[2]

The 2004 Act definition of anabolic steroids was broadened with the enactment of DASCA. The 2004 Act required the DEA to prove that a compound was "chemically and pharmacologically related to testosterone." DASCA broadened that definition to apply to a drug or hormonal substance that is "derived from or has a chemical structure substantially similar to, one or more anabolic steroids listed in sub paragraph (A)". The definition set forth in DASCA gave the attorney general the power to classify a broader set of potential anabolic steroids by permitting those compounds to more easily fit into the definition of anabolic steroids.

DASCA amended the CSA and added twenty-five new anabolic steroids as Schedule III controlled substances. Dimethazine, methylstenbolone and methyl-1-etiocholenolol were **NOT** added as controlled substances under DASCA nor had they been scheduled and made a part of the CSA in any prior legislation. *Id.*

**A.**     

---

[2]Designer Anabolic Steroid Control Act of 2014, Pub. L. No. 113-260, 128 Stat. 2929



9



**B.      The Classification Authority Of The Attorney General**

The scheduling authority of the attorney general is set forth in section 2(b) of DASCA. It amended section 201 of the CSA and provides: **"the Attorney General may issue a temporary order adding a drug or other substance to the definition of anabolic steroids. If the Attorney General finds that - (A) the drug or other substance satisfies the criteria for being considered an anabolic steroid under section 802 (41)(A) but is not listed in that section or by regulation of the Attorney General as being an anabolic steroid; and (B) adding such drug or other substance to the definition of anabolic steroids will assist in preventing abuse or misuse of the drug or other substance."** (*emphasis added*)  *Id.* This provision was the keystone of DASCA. It was meant to solve the long standing problem of the time delays in scheduling designer anabolic steroids to keep pace with slight changes in the chemical structure to avoid criminal penalties. The burdensome process discussed above would no longer prevent law enforcement and prosecuting authorities from targeting the manufactures and sellers of designer anabolic steroids in real time.

The classification authority granted to the attorney general provides that **"an order issued under paragraph (1) shall not take effect until 30 days after the date of the publication by the**

**Attorney General of the notice in the Federal Register of the intention to issue such order and the grounds upon which such order is issued. The order shall expire not later than 24 months after the date that it becomes effective except that the Attorney General may during the pendency of the proceeding under paragraph (6) extend the temporary scheduling order for up to six months. The Attorney General shall transmit notice of an order proposed to be issued under paragraph (1) to the Secretary of Health and Human Services in issuing an order under paragraph (1) the Attorney General shall take into consideration any comments submitted by the Secretary in response to a notice transmitted pursuant to this paragraph."** (*emphasis added*)

*Id.* DASCA was landmark legislation. It gave the attorney general temporary scheduling authority and eliminated the months or years long process required previously. It also, however, placed certain responsibilities on the attorney general before he/she could temporarily schedule an anabolic steroid. The bill requires:

1.    That the Attorney General can make a finding that a drug or other substance meets the statutory definition of anabolic steroid;

2.    The Attorney General must determine that adding such a drug or other substance where it assists in preventing misuse and abuse;

3.    It requires the Attorney General to publish a notice in the Federal Register of the intention to issue a temporary order (for the obvious reason that the public be given notice so that they would have the option of objecting to the temporary order);

4.    That the Attorney General must set forth the grounds under which the temporary order is being issued;

11

5.    That the Attorney General is required to transmit a notice of a temporary order to the Secretary of Health and Human Services (HHS);

6.    The legislation requires the Attorney General to take the Secretary of HHS comments into consideration, and

7.    That a temporary order shall not take effect until 30 days after the date of the publication by the Attorney General of the notice in the Federal Register. *Id.*

DASCA further provides that such temporary order shall not expire later than 24 months after the date it becomes effective, however it gives the attorney general the power to extend the 24 month deadline for up to an additional 6 months additional during the pendency of the proceeding.

**C.    Permanent Scheduling**

DASCA provides that "a temporary scheduling order issued under paragraph (1) shall be vacated upon the issuance of a permanent scheduling order under paragraph (6). *Id.* It further provides that the attorney general may issue a permanent order adding a drug or other substance to the definition of anabolic steroids if such drug or other substance satisfies the criteria for being considered an anabolic steroid under section 102(41).

**Dimethazine, Methylstenbolone and Methyl-1-etiocholenolol have never been scheduled under DASCA, either of the preceding anabolic steroid legislation or under the CSA.** Not only are they not scheduled, but apparently no attempt has ever been made by the attorney general to temporarily or permanently schedule them.

**D.    Congressional Intent And Legislative History**

Any argument that the definitional provisions which direct and give substance to the attorney general in his/her scheduling authority is an analog act similar to previous acts passed by Congress fails when the congressional record concerning DASCA is examined. In addressing the problems and frustrations of the previous laws regarding anabolic steroids various representatives spoke on the record. Representative Pitts stated, "DASCA will help protect consumers from these harmful products by giving the DEA the tools and authority to properly classify designer steroids as controlled substances and increase criminal penalties for importing, manufacturing or distributing them under false labels." *Id.* Representative Pitts went on to explain the procedure and the purpose of DASCA "DASCA would...Grant the DEA the authority to temporarily schedule new designer steroids on the controlled substance list for 24 months, with the possibility of the 6 months extension so that if bad actors develop new variations these products can be removed from the market immediately."[3]

Regarding Congress' intent, Congresswoman Christensen stated "H.R. 4771 would amend the controlled substance act to expand the definition of anabolic steroids to include 25 additional chemicals thereby facilitating the control by the Drug Enforcement Agency." *Id.* Congresswoman Christensen went on to explain, "[h]owever, chemists, as you have heard are able to design around the list creating new anabolic steroids that are not on the CSA list. The DEA therefore has a more difficult time taking enforcement actions against people using them. The bill will also make it easier for the drug enforcement agency to add subsequent designer chemicals to the list of anabolic steroids and increase civil and criminal penalties for offenses pertaining to anabolic steroids." *Id.*

---

[3]Designer Anabolic Steroid Control Act of 2014, H.R. 4771, 113th Cong.

Congresswoman Christensen's comments made it clear that while DASCA made it easier for the DEA and/or the attorney general to classify new compounds as Schedule III controlled substances, DASCA still requires the DEA to add subsequent designer chemicals to the controlled substance act by scheduling them.

Congressman Waxman stated regarding the proposed DASCA legislation, "[t]his legislation will amend the controlled substances act, the CSA to include 25 additional chemicals as anabolic steroids. It will also make it easier for the drug enforcement agency, DEA, to add additional chemicals to the CSA list of anabolic steroids." *Id.* Waxman further stated, "[o]ne challenge our nation has faced in stopping steroid abuse is that chemists are continually finding ways to design new versions of these drugs that can escape detection or evade the law. This bill helps address this problem. It will give DEA new tools to control the abuse of designer steroids and will help get them off the market". *Id.*

It is axiomatic that if Congress had made itself clear by the wording of the statute, the courts should follow Congress' expressly worded intent. The Eleventh Circuit Court of Appeals has held that "[w]here the intent of Congress is expressed in the text of a statute in reasonably plain terms, we must give effect to that intent". *National Coal Associations v. Chater* 81 F. 3d 1077, 1081-82 (11th Cir. 1996). Likewise in *CBS Broad Inc. v Echostar Commc'ns Corp.*, the court stated "if the statute's meaning is plain and unambiguous, there is no need for further inquiry". 532 F.3d, 1294, 1300-1301 (11th Cir. 2008).

DASCA granted the power to the attorney general to temporarily and then permanently schedule anabolic steroids. They did this at the request of the DEA and the FDA to keep pace with

14

an industry avoiding criminal exposure by constantly modifying its products. The solution that the DEA and FDA settled upon was to grant temporary scheduling authority to the attorney general which would only take thirty days from when the attorney general gave notice of his/her intent to schedule a drug. The Congressional record is clear. The definitional language was inserted to set strict guidelines for the attorney general. Dimethazine, methylstenbolone, and methyl-1-etiocholenolol are not Schedule III anabolic steroids because the attorney general has not temporarily or permanently scheduled these substances. No notice has ever been published in the Federal Register by the attorney general, or the DEA, signifying an intention to temporarily classify dimethazine, methylstenbolone, or methyl-1-etiocholenolol. No proceedings have ever been undertaken to permanently classify dimethazine, methylstenbolone, or methyl-1-etiocholenolol. No notice has ever been transmitted to the Secretary of HHS in regard to dimethazine, methylstenbolone, or methyl-1-etiocholenolol as to those substances. None of the requirements of DASCA have been met. These three substances are therefore not as of yet illegal under the Controlled Substances Act/DASCA.

DASCA grants the attorney general the authority to schedule recently emerged anabolic steroids. The statute is clear and unequivocal on what guidelines the attorney general must follow. If dimethazine, methylstenbolone and methyl-1-etiocholenolol can be automatically scheduled, the purpose of the statute would be rendered meaningless and would be in direct conflict with the express language in the statutory text.

**IV       The Canons of Statutory Construction Supports Defendants' Position**

The canons of statutory construction can assist in interpreting DASCA if there are any issues concerning its interpretation.

Only "[w]here the statutory language is not entirely transparent... the Court has tools at its disposal for elucidating the meaning without reverting to the legislative history. These tools are the Canons of Construction" *CBS Inc. v Primetime 24 Joint Ventures,* 245 F.3d 1217, 1225 (11th Cir. 2001). "A court's use of statutory construction rules is appropriate only 'in the 'rare cases [in which] the literal application of a statute will produce a result demonstrably at odds with the intentions of its drafters... or when the statutory language is ambiguous.' In all other instances, '[t]he plain meaning of the statute controls [the court's] interpretation....'" *Kelley v. E.I. DuPont de Nemours and Co.*, 17 F.3d 836, 842 (6th Cir. 1994); (citing *U.S. v. Steele*, 933 F2d 1313, 1317 (6th Cir.) (citations omitted)). No such ambiguity exists here.

### A.      The Superfluous Canon

The superfluous canon states that a statute ought to be construed so that "no clause, sentence, or word shall be superfluous, void, or insignificant." It is a "cardinal principle of statutory construction" that "a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *Duncan v. Walker*, 533 U.S. 167, 174 (2001) (internal quotation marks omitted); see *United States v. Menasche*, 348 U.S. 528, 538-539 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute.'" (citing *Montclair v. Ramsdell*, 107 U.S. 147, 152 (1883))). "A construction which would leave without effect any part of the language used should be rejected, if an interpretation can be found which will give it effect." *Quarantello v. Leroy*, 977 So.2d 648, 651-52 (Fla. 5th DCA 2008).

16

If DASCA is interpreted in the manner suggested in the Indictment, numerous sections of DASCA would be superfluous, void, or insignificant. The broadened scheduling powers granted to the attorney general become superfluous if DASCA is interpreted to render dimethazine, methylstenbolone and methyl-1-etiochloenolol automatically controlled.

As explained herein, DASCA amended the definition of "anabolic steroid" and added twenty-five new compounds to Schedule III of the CSA. If DASCA is interpreted in the manner suggested in the Indictment, and a compound that meets the definition of "anabolic steroid" is automatically a Schedule III controlled substance, the listing of twenty-five compounds in DASCA would be superfluous. "...[T]he canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme." *Marx v. Gen. Revenue Corp.*, 568 U.S. 371, 386 (2013). "We are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *Id.* (citing *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988)). If DASCA is interpreted in the manner suggested in the Indictment, numerous sections of DASCA would be rendered superfluous.

As explained in the motion, prior to DASCA sixty-three anabolic steroids were listed as Schedule III controlled substances in the CSA. If DASCA is interpreted to automatically make every compound that meets the definition of "anabolic steroid" a controlled substance, Congress could have simply referred to the previous lists set forth in the 1990 and 2004 Act without adding twenty-five redundant compounds. No additional steroids would need to have been listed in DASCA. This point was emphasized by the Supreme Court in dealing with a similar issue in a criminal statute, "[h]ad Congress intended the latter 'all encompassing' meaning, we observed, 'it is hard to

see why it would have needed to include the examples at all.'" *Yates v. United States*, 574 U.S. 528 (2015). Interpreting DASCA in the manner suggested in the Indictment would cause the entire list of twenty-five anabolic steroids set forth in DASCA to be superfluous and void.

As previously stated herein, in addition to amending the definition of "anabolic steroid," and adding twenty-five new anabolic steroids to the CSA, DASCA granted the attorney general the authority to temporarily and permanently classify recently emerged anabolic steroids. If DASCA is interpreted in the manner suggested in the Indictment, the section of DASCA granting the attorney general the authority to temporarily and permanently schedule recently emerged anabolic steroids would be superfluous. There would be no reason for Congress to grant the attorney general that authority, if DASCA automatically scheduled every compound that meets the definition of "anabolic steroid." Section 2(b)(I) of DASCA states that the attorney general "may issue a temporary order adding a drug or other substance to the definition of anabolic steroids if the attorney general finds that"[4] the drug or other substance meets the definition set forth in DASCA and adding it would assist in preventing abuse or misuse of the drug or other substance. To interpret DASCA in the manner suggested by the Indictment would render the "temporary order" referred to in this section, superfluous, void, and insignificant. Furthermore, the Section continues by stating "(2) An order issued under paragraph (1) shall not take effect until 30 days after the date of the publication by the attorney general of a notice in the Federal Register...." If DASCA was interpreted in the manner suggested in the Indictment, this time constraint would be rendered superfluous, void, and insignificant.

---

[4]Designer Anabolic Steroid Control Act of 2014, Pub. L. No. 113-260, 128 Stat. 2929

The Court in *Gonzalez v. Oregon* found that "it would be anomalous for Congress to have painstakingly described the attorney general's limited authority to deregister a single physician or schedule a single drug, but to have given him, just by implication, authority to declare an entire class of activity... a criminal violation of the CSA." 126 S.Ct. 904 909 (2006). Likewise, here we are confronted by a situation where scheduling authority is painstakingly reworked into a new (albeit still limited) format, while impliedly making a whole class of compounds scheduled. As in *Gonzalez*, the DASCA situation can not survive logical scrutiny. DASCA does not abrogate scheduling requirements for anabolic steroids, it simply provides for easier determination of what is, and is not, an anabolic steroid (which can then be quickly scheduled with the attorney general's new powers under the Act).

If DASCA is interpreted to automatically schedule every compound that meets the definition of "anabolic steroid," the procedures the attorney general is required to follow would also be superfluous, void, insignificant and to put it bluntly, a waste of time. There would be no need to publish notice in the Federal Register, and no need for an effective date. This same section sets forth an expiration date for a temporary order issued by the attorney general; "[t]he order shall expire not later than 24 months after the date it becomes effective, except that the attorney general may, during the pendency of proceedings under paragraph (6), extend the temporary scheduling order for up to 6 months." If DASCA is interpreted in such a manner as to allow charging defendants with violations of the CSA, besides there being no need to issue a notice in the Federal Register, there would be no need to set an expiration date, and no need for "proceedings" under paragraph (6) of DASCA. To interpret DASCA in the manner suggested in the Indictment would render these sections superfluous, void, and insignificant.

Section 2(b)(i)(3) states, "[t]he Attorney General shall transmit notice of an order proposed to be issued under paragraph (1) to the Secretary of Health and Human Services. In issuing an order under paragraph (1), the Attorney General shall take into consideration any comments submitted by the Secretary in response to a notice transmitted pursuant to this paragraph." *Id.* If all compounds that meet the definition of "anabolic steroid" are automatically Schedule III controlled substances, there would be no need for Congress to include the language that the attorney general shall transmit notice to the Secretary of HHS. Furthermore, there would be no need for Congress to include the requirement that the attorney general take any comments submitted by the secretary into consideration. To interpret DASCA in the manner suggested in the Indictment would cause this entire section to be superfluous, void, and insignificant.

### B.    The Harmonious-Reading Canon

In addition to the superfluous canon, the harmonious-reading canon states that a court should "interpret [a] statute as a symmetrical and coherent regulatory scheme, and fit, if possible, all parts into a harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.* 529 U.S. 120, 133 (2000). ("Where possible, courts must give full effect to *all* statutory provisions and construe related statutory provisions in harmony with one another."). *Cox Enterprises, Inc. v. Pension Ben. Guar. Corp.,* 666 F.3d 696, 704 (11th Cir. 2012) (citing *Forsythe v. Longboat Key Beach Erosion Control Dist.,* 604 So.2d 452, 455 (Fla. 1992). ("Courts generally turn to an *in* pari materia analysis to resolve a statutory ambiguity....")(quotation marks and alterations omitted); *Martin v. U.S.,*389 F.2d 895, 897 (5th Cir. 1968)... ("[T]he '*in* pari materia ' canon of statutory construction would be appropriate only if we found the statute ambiguous...."); *State v. Nix*, 220 Ga.App. 651, 469 S.E.2d 497, 499

20

(1996) (explaining that "in pari materia may not be resorted to where the language of the statute under consideration is clear") (quotation marks omitted). *U.S. v. Warren,* 820 F.3d 406, 408 (11th Cir. 2016).

A reading of DASCA that circumvents the proper scheduling of appropriate compounds renders not only portions of DASCA meaningless, but also much of the previous anabolic steroid acts moot. It defies logic that Congress would author three separate lists to ban specific anabolic steroids, over the course of thirty years, yet in the legislative act that created the final list, render it and every prior list irrelevant. Concomitantly, it would be nonsensical to grant temporary and permanent scheduling powers to the attorney general, if the same piece of legislation instantly scheduled any potential drug to which those new powers could apply.

### C.      The Lenity Canon

Ambiguities in a statute should be resolved by the courts in favor of the Defendant. Justice Holmes wrote, "[a]lthough it is not likely that a criminal will carefully consider the text of the law before he murders or steals, it is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed. To make the warning fair, so far as possible the line should be clear." *McBoyle v. United States*, 283 U.S. 25, 27 (1931). The Supreme Court therefore cautions against federal criminal statutes being read too expansively. *United States v. McLean*, 802 F.3d 1228, 1231 (11th Cir. 2015); (citing, *Yates v. United States*, 574 U.S. 528 (2015)).

In *Yates*, the Supreme Court ruled that the rule of lenity is violated when the government's overly broad interpretation of a criminal statute poses a significant risk [of] excessive punishment.

In the instant matter, interpreting DASCA to automatically schedule all compounds that meet the definition of "anabolic steroid," without the need for the DEA to add those compounds to the CSA, is the very definition of an overly broad interpretation of a criminal statute.

To satisfy due process, "a penal statute [must] define the criminal offense [1] with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." *Skilling v. United States*, 558 U.S. 945 (2009); (citing, *Kolender v. Lawson*, 461 U.S. 352, 357 (1983))).

Interpreting DASCA in the manner suggested by the government in this case would prevent ordinary people from understanding what conduct is prohibited and would result in arbitrary and discriminatory enforcement. Under the government's interpretation, criminal enforcement can be brought whenever the government discovers a new compound without listing that compound in the CSA and without providing notice. Under the government's interpretation of DASCA, an ordinary person would be required to determine whether or not a compound is derived from, or has a chemical structure substantially similar to, 1 or more anabolic steroids listed in DASCA. As shown in the DEA's Notices of Proposed Rulemaking in 2008 and 2011, this determination is heavily reliant upon science and testing and could not be accomplished by an ordinary person. Furthermore, interpreting DASCA in this manner denies manufacturers, physicians, and legitimate researchers the ability to comply with the CSA. As set forth in DASCA, anabolic steroids must be labeled in a particular manner and appropriate credentials must be obtained in order to manufacture or possess Schedule III controlled substances. Without publication in the Federal Register of what compounds are controlled, legitimate manufacturers, physicians, and researches could inadvertently violate the CSA

and face criminal charges without notice. For these reasons, at a minimum the Court should find that DASCA is ambiguous and should apply the rule of lenity in favor of Defendants.

### D.       The Constitutional-Doubt Canon

A single undefined word in a statute can render it unconstitutional. The Supreme Court, in striking down a New Jersey statute that failed to define the word "gang," denounced as unconstitutional such terms when employed "to indicate what it purports to denounce [that] are so vague, indefinite and uncertain that it must be condemned as repugnant to the due process clause of the Fourteenth Amendment." *Lanzetta v. New Jersey*, 306 U.S. 451, 458 (1939).

"When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principal that this court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided." *Crowell v. Benson*, 285 U.S. 22, 62 (1932). With the term "designer steroid" wholly undefined in DASCA, Defendants' interpretation is the only possible construction that leaves whole due process and maintains constitutionality.

### REQUEST FOR ORAL ARGUMENT

Due to the complicated and technical matters addressed in this motion, Defendants request that the Court set this matter for oral argument.

Pursuant to Local Rule 88.9, undersigned counsel Richard G. Lubin contacted DOJ Trial Attorney Alistair Reader who objects to this motion.

**WHEREFORE**, for the reasons set forth herein, Defendants' request that this motion be

granted.

Dated this 10th day of February, 2020.

Respectfully submitted,

**RICHARD G. LUBIN, P.A.**
707 North Flagler Drive
West Palm Beach, FL 33401
Telephone: 561-655-2040
Facsimile: 561-655-2182
Email: rich@lubinlaw.com
Attorneys for Defendant Singerman

By:   */s/Richard G. Lubin*
**RICHARD G. LUBIN**
Fla. Bar No. 182249

*/s/ Amy Morse*
**AMY MORSE, ESQ**.
Morse & Morse, LLC
Of Counsel to Richard G. Lubin, P.A.
707 North Flagler Drive
West Palm Beach, FL 33401
T: (561) 651-4145; F: (561) 655-2182
Email: amy@morselegal.com
FL Bar No.: 0388475
Co-Counsel for Defendant Singerman

*s/Benedict P. Kuehne*
**BENEDICT P. KUEHNE**
Florida Bar No. 233293
**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Defendant Braun

24

_s/Michael T. Davis_
**MICHAEL T. DAVIS**
Florida Bar No.: 63374

_s/Susan Dmitrovsky_
**SUSAN DMITROVSKY**
Florida Bar No. 73296

**KUEHNE DAVIS LAW, P.A.**
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
mdavis@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Defendant Blackstone Labs, Inc.

_/s/ Robert J. Buonauro_
**ROBERT J. BUONAURO, B.C.S.**
435 Canal St., Suite 208
New Smyrna Beach, FL 32168
407-841-1940
Fax: 407-649-1936
Florida Bar No.  150756
Counsel for Defendant Winsauer
robert@buonauro.com

_/s/ Nancy Vorpe Quinlan_
**NANCY VORPE QUINLAN**
515 North Flagler Drive, Suite 701
West Palm Beach, FL 33401
Tel: 561-721-0552
Email: nquinlan@palmbeachdefense.com
Florida Bar No. 593532
Counsel for Defendant Ventrella

*/s/ Robert Shearin*
**ROBERT SHEARIN**
1700 S. Dixie Hwy., Suite 501
Boca Raton, FL 33432
Tel: 561-706-7572
Fax: 561-429-2987
Email: rlshearin1@yahoo.com
Florida Bar No.: 47759
Counsel for Defendant Ventech Labs, LLC

*/s/ J. Stephen Salter*
**J. STEPHEN SALTER**
8975 Pompano Way
Gulf Shores, Alabama 36542
Phone: 205-585-1776
Email: umstakwit@aol.com
Admitted Pro Hac Vice for Defendant Boccuzzi

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on February 10, 2020, I electronically filed the foregoing document with the Clerk of Court using CM/ECF and that the foregoing document is being served this day on all counsel of record or *pro se* parties, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:   */s/ Richard G. Lubin*
      **RICHARD G. LUBIN**