## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
### CASE NO. 19-80030-CR-DIMITROULEAS/MATTHEWMAN

**UNITED STATES OF AMERICA,**

**vs.**


**PHILLIP BRAUN,**
**AARON SINGERMAN,**
**ANTHONY VENTRELLA,**
**JAMES BOCCUZZI,**
**DAVID WINSAUER,**
**BLACKSTONE LABS, LLC, and**
**VENTECH LABS, LLC.,**
           **Defendants.**
_____/


## JOINT DEFENSE MOTION IN LIMINE TO EXCLUDE CERTAIN WITNESSES FROM TESTIFYING AT TRIAL AND MOTION TO STRIKE SURPLUSAGE FROM THE INDICTMENT, WITH INCORPORATED MEMORANDUM OF LAW


After naming a single alleged victim ("C.H.") in its Indictment (DE1), and the parties having engaged in extensive discovery obtaining that person's relevant medical history, the Government has only recently indicated it intends to offer evidence at trial of an undetermined number of other "complaining customers" who complained to Blackstone Labs, LLC ("Blackstone") in some fashion about a supplement product.  These complainants will allegedly testify to their personal beliefs that the supplements caused physical ailments. The Defendants object to the proposed use of other "complaining customers" in the upcoming trial for many reasons.  Namely, the Government's use of these complaining customers (1) would significantly alter the allegations in the Indictment by presenting testimony that various nutraceutical supplements caused adverse health and wellness effects, (2) would significantly lengthen the trial with wholly irrelevant matters, (3) will prejudice the jury against the defendants by playing on the sympathy and emotion of the jury, (4) will impermissibly infer bad character, (5) will unfairly and prejudicially confuse the jury about the relevant issues in the case, (6) will tend to

bolster the dubious claim that C.H. suffered serious bodily injury as a result of using Blackstone's product, and (7) at least with respect to two of the customers, require the disclosure of new medical records and add additional medical expert witness expense.

When defense counsel asked in a telephone conversation, followed by a letter, whether the prosecution intended to call customer witnesses beyond C.H., the Government admitted its intention, and then pointed to the broad wording of Count 1 as supporting its position that such allegations were admissible. The Government's supposition is that customer complaints were required to be reported to the FDA and the failure to report is proof of a conspiracy or scheme to defraud the FDA.   Accordingly, the Defendants diligently searched the millions of pages of government-produced discovery to identify emails and other potentially important documents of complaining customers.   Defense counsel researched the regulatory requirements for reporting complaints to the FDA.   The reporting requirement applies only to "serious adverse events," which term is narrowly defined in the applicable statutes.

The Government's attempt to introduce evidence regarding customer complaints that are not required to be reported because they fall outside the legal definition serves as a transparent attempt to bolster the statutory offense enhancement alleging "serious bodily injury" in Count 4 incurred by C.H., the only named "victim" in the Indictment.   This allegation about C.H. is a sentencing enhancement that must be proven beyond a reasonable doubt.   Two other customers who told Blackstone employees in an email about supposedly needing medical treatment, in one instance an endoscopy and in the other a hospital stay, should not be permitted to present their individual complaints to the jury.   To defend against these witnesses alone requires obtaining additional medical records for at least the 6 months prior to the claimed injuries and six months afterwards. When defense counsel attempted to do exactly that for the one named "victim"

2

(C.H.), obtaining the medical records took more than 6 months, and then having that medical documentation examined by a medical expert required many additional months. Just preparing for the C.H. portion of the Indictment required at least one (1) year of work on the critical issues of injury and causation. And the cost to the Defendants was in the tens of thousands of dollars.

Defendants therefore move to (a) exclude from testifying at trial other "complaining customers," including, but not limited to, persons the Defendants have identified through their search efforts (K.S.); (T.L.); (J.C.); (K.K.); (M.G.); (D.G.); (G.S.); (J.Z.); (C.D.); (R.R.); (S.L.); (S.N.); and any other similarly situated individuals; and (b) strike from the Indictment surplusage that the Government may attempt to use in its effort to embed these other unnamed complaining customers into the trial.  Otherwise, this already lengthy trial risks becoming even longer and will be turned unfairly into mini-product liability cases with no attendant proof of causation.

## MOTION IN LIMINE

1.      Count 1 of the Indictment charges that the Defendants willfully conspired to defraud the United States by impairing, impeding, obstructing, and defeating the lawful functions of the Food and Drug Administration, in violation of Title 18, United States Code, Section 371.  The maximum penalty for this offense is 5 years.

2.       Count 4 charges a conspiracy under Title 21, United States Code, Section 846. That Count included a sentencing enhancement: "It is further alleged pursuant to Title 21, United States Code, Section 841(b)(1)(E)(i) that serious bodily injury resulted to C.H. from the use of methyl-1-etiocholenolol." This allegation of "serious bodily injury," if proven beyond a reasonable doubt, increases the statutory maximum penalty for Count 4 by five years in prison, that is, from 10 years to 15 years.  *See* 21 U.S.C. § 841(b)(1)(E)(i).  It also enhances the Base Offense Level Sentencing Guideline calculation by 6 levels.   United States Sentencing

3

Guidelines 2D1.1(a)(4).

3.      Some medical records of the named victim (C.H.) were initially provided to the defense in the Government's discovery.  But these records were woefully incomplete.  During three days of motion hearings in March of 2020, defense counsel discussed with the Court the need for C.H.'s complete medical records to defend the case.  The Court ordered the parties to work together to obtain the needed medical history documentation.  On March 20, 2020, Defendants and the Government jointly filed a motion for eight pretrial subpoenas addressed to separate doctors and medical facilities for C.H.'s medical records, which this Court granted. After obtaining C.H.'s medical records, the Defendants hired a medical expert who reviewed these records.  His expert medical report was filed with the Court and copies of all the medical records produced by the subpoenas were timely provided to the Government.

4.      Despite the obvious importance of victim medical history documentation, the potential appearance of other victims or complaining customers was never put forward by the Government or discussed during the March 2020 hearings.

5.      Instead, this issue was highlighted only when the Government served Production 18 on December 10, 2020, 10 months later and well after the discovery production deadline (and even further beyond the time the Government announced to the Court that it had already produced "nearly all" the discovery.  That belated discovery Production included a "receipt" for the purchase of an alleged Blackstone product by an individual "R.R." (names of potential witnesses are referred to by initials, although this pleading was served on the government with the full names included) from a supplement store in Brunswick, Georgia.  Emails in the discovery showed that R.R. had previously sent an email to Blackstone in which he complained he had "gotten sick" from a Blackstone product. Defense counsel promptly asked the

4

Government by telephone, and then with a follow-up letter on January 6, 2021, whether the Government planned to call R.R. and some other complaining customers at trial the Defendants' search had identified.

6.     The Government responded by letter dated January 14, 2021, that it intended to call additional such witnesses named in the letter.  The Government indicated that memoranda of interviews or witness statements of those complaining customers had been provided in discovery. The Government described some medical records in discovery for R.R and S.L. However, the Government did not limit itself solely to the customers listed in defense counsels' letter.  In the telephone call, the Government cited the broad language of Count 1.  This would allow the prosecution to surprise the defense with any and every indication of customer experience with the nutraceutical supplements. The Government will nonetheless attempt to introduce evidence of customer health complications in its effort to prove the alleged conspiracies.

7.     Nowhere does the Indictment identify a specific provision of federal law that Defendants violated by allegedly failing to notify the FDA of customer complaints.

8.     As will be explained in more detail in the Memorandum of Law below, the FDA requirement to report complaints only applies to a "serious adverse event," which is legally defined as, one that results in death, a life-threatening experience, inpatient hospitalization, a persistent or significant disability or incapacity, a congenital anomaly or birth defect, or requires, based on reasonable medical judgment, a medical or surgical intervention to prevent an outcome described above.

9.     Based on the defense key word search of millions of pages of discovery, the following information is currently available regarding what some complaining customers told

Blackstone **at one time.** This is obviously a critical distinction.  Below, the Defendants have isolated the information provided to Blackstone by its customers.  That information is in bold. Additional information later collected from these individuals, or failed to be collected, by the government during the subsequent investigation is not in bold but is provided as context.

a.    *K.S.*  **He emailed Blackstone, claiming to have become light-headed.** There is no indication of medical treatment.  No medical records were provided in discovery.

b.    *T.L.*  **He sent an email to Blackstone in August 2016, claiming that he had severe stomach cramps after taking a Blackstone product.  But he requested a replacement product.  T.L. also ordered additional types of products, including some for his girlfriend, growing impatient when the replacement products did not arrive soon enough.**  There is no evidence that he sought medical treatment.  The Government did not provide medical records.

c.    *J.C.*  **He emailed Blackstone on November 8, 2014, that he took one of its products (Super DMZ RX 2.0) and inquired whether a sharp pain in his head and blurry vision could be a side-effect. He ordered additional products on May 17, 2016, June 30, 2016, July 12, 2016, and August 9, 2016.** There is no information indicating medical treatment.  No medical records were provided in discovery.

d.    *K.K.*  **He emailed Blackstone inquiring whether swollen gums in the back of his mouth are a side-effect.**  There is no indication of medical treatment. No medical records were provided in discovery.

e.    *M.G.*  **This member of the military sent an email to Blackstone reporting that he ordered the "stack 3 times about 3-4 months. The stack did work for me."  He told Blackstone he experienced gynecomastia (swollen breasts) with discharge.  He sent his blood work to the Blackstone customer service email and was told by a Customer Representative to see a doctor.** The Government provided no medical records or records of hospitalization for this witness.

f.    *D.G.*  **He sent an email to Blackstone saying he used a Blackstone product (Cobra 6) which he bought from Strong Supplements Shop.com.  He took it for 3 days and had to stop.  "I have an 8 week tight as F*** starting next week.  Just wanted to let you know.**  He told the agents he drank milk, stopped the product, and did not need medical assistance.  No discovery was provided about any subsequent medical follow-up. No medical records.

6

g.      *G.S.*  **He emailed PJ Braun directly, confiding that he had two emergency room visits for anxiety and panic attacks and was placed on a heart monitor overnight during the second visit.  No abnormalities were identified during his stay, and he was released the following morning.  When he asked for advice regarding whether he should take stimulants, Braun wrote back that he should stop all stimulants, including coffee, advising him to drink green tea and reduce his stress.**

In his interview with the Government, G.S. admitted to a history of panic attacks going back to childhood.  He also attributed some of his symptoms to his lifestyle during 2016, explaining he was only getting 4 hours of sleep a night and was drinking a half pint of whisky each night before bed to help him sleep.  With the supplements and coffee combined, he was ingesting 500-1000 mg of caffeine per day.  G.S. claimed to have incurred approximately $500.00 in medical debt resulting from emergency room and family practice physician visits. He admitted he was not sure that Blackstone products caused his issues, and he continued to take its products. The Government provided no medical records and no records showing that Defendants' products caused his anxiety and panic attacks.

h.      *J.Z.*  **He sent Blackstone an email on December 18, 2013, saying that its products caused him to have surgery for an ulcer.  However, he ordered another product from Blackstone after the alleged date of his surgery and did not mention any problems.**  No medical records were provided by the Government.

i.      *C.D.*.  The Government provided their records about this grandmother who told them her minor grandson obtained a Blackstone product.  Pretrial investigation by the FDA concluded he likely purchased the product on eBay.  Grandmother C.D. described her grandson's adverse effects as "jumpy, nervous and edgy."  She told the Government that she called Blackstone to complain about the product.  The Defendants have been unable to find any Blackstone records of her alleged call.  The grandson did not go to the doctor and there is no information indicating medical treatment.  No medical records were provided in discovery.

10.      These emails or alleged telephone calls never provided notice to Blackstone of any legal obligation, and they do not provide enough detail to put Blackstone on notice that they qualify under the statutory definition of "serious adverse event."  Because the complaints were not legally required to be reported to FDA, they are wholly irrelevant to Count 1.  These complaints, for instance, by Grandmother C.D., do nothing more than unfairly and irreparably

prejudice the Defendants in an attempt to portray them as guilty actors.

11.     Because these customers were not identified in Count 4 of the Indictment, they are not relevant to the five-year sentencing enhancement that the Government seeks due to the alleged "serious bodily injury" suffered by C.H.

12.     There is a significant risk that if the jury learns that approximately a dozen or more people complained to Blackstone about real or imagined adverse effects of a product, the jury may feel more sympathy for C.H. or otherwise decide the C.H. issues for reasons other than a dispassionate analysis of whether the Government proved its allegation that the specific Blackstone product, Alpha 1 Max, allegedly taken by C.H., caused C.H.'s serious bodily injury beyond a reasonable doubt.

13.     Therefore, the category of "complaining customers" should not be permitted to testify.

14.     Moreover, the Court should strike a sentence in Paragraph 7 on page 9 of the Indictment as being an inaccurate statement of the law; all of Paragraph 11 on page 12; and all of Paragraph 36 on page 16, as they are mere surplusage – vague language that serves as nothing more than a potential conduit for irrelevant evidence.

## MEMORANDUM OF LAW

### A.Motion to Exclude Complaining Customers

Count 1 of the Indictment charges that all Defendants conspired to defraud the United States by "impairing, impeding and obstructing, and defeating, through deceitful and dishonest means, the lawful functions of the United States Food and Drug Administration."   The Indictment states that the Food and Drug Administration (the "FDA") was the federal agency responsible for enforcing the regulations of the Federal Food, Drug and Cosmetic Act

8

("FDCA"), 21 U.S.C. § 301 *et seq.*  Nowhere in Count 1 is there any allegation setting forth the specific provision(s) of the FDCA the Defendants violated.  Nor is there any description of the law correctly informing the jury of the obligation of supplement companies to report "serious adverse events" to the FDA.

The Food, Drug and Cosmetic Act ("FDCA"), 21 U.S.C. Section 301 *et seq.*, regulates a great deal: food, drugs, supplements, cosmetics, durable medical equipment, firearm laser sights (because they emit radiation), and other items in voluminous specific provisions and regulations. The original provisions of the Dietary Supplement Health and Education Act of 1994 did not create any health-related reporting obligations for the dietary supplement industry. Reporting obligations were later added but they curtailed the FDA's reach in regulating, for example, the sale of ephedra products.  *See Dietary Supplement and Nonprescription Protection Act*, Cong. Research Serv. RS22480 (2007).  These Congressional discussions led to the enactment of the Dietary Supplement and Nonprescription Protection Act of 2006 ("DSNPA"), which amends various provisions of the FDCA, in particular 21 U.S.C. 379aa-1, the recordkeeping and mandatory reporting obligations of "Responsible Parties" in certain defined situations.  The reporting requirement is narrowly tailored as articulated in Senate Report 109-324:

> The committee has limited the reporting requirement to the information FDA really needs: reports of death; a life-threatening experience; hospitalization; a persistent or significant disability or incapacity; a congenital anomaly or birth defect.  *In limiting the reporting system to serious events only, the committee recognizes that any broader reporting system could overburden manufacturers, consumers and the agency alike, generating information that may not be useful to the public health system at tremendous cost to all involved.*

*Id.* at 6 (emphasis added).

Obviously, swollen gums and a 15-year-old who is acting jumpy do not fit the definition of "serious adverse event."  The Government alleges in Count 1 that Defendants advanced their

9

conspiracy to obstruct the FDA by failing to make mandatory reports of consumer complaints to the FDA. The FDCA, as amended by DSNPA, only triggers mandatory reporting for "serious adverse events." 21 U.S.C. 379aa-1(b)(1) ("[The responsible party] shall submit to the Secretary any report received of *a serious adverse event* associated with such dietary supplement. . . ."). 21 U.S.C. § 379aa-1(a)(1) defines an "adverse event" as any health-related event associated with the use of a dietary supplement that is adverse.  A "serious adverse event" is defined as

> one that results in death, a life-threatening experience, inpatient hospitalization, a persistent or significant disability or incapacity, a congenital anomaly or birth defect, or requires, based on reasonable medical judgment, a medical or surgical intervention to prevent an outcome described above.

*Id.* at (a)(2).

Both the text of the statute and its legislative history place adverse events on a two-tier system, as Responsible Parties must: (1) maintain records of both serious and nonserious adverse events for 6 years; and (2) report all serious adverse events to the Secretary of the FDA with 15 business days of receipt.  *Compare* 21 U.S.C. 379aa-1(b)(1) (creating mandatory reporting requirement for serious adverse events) *with* (e)(1) (creating 6-year record maintenance requirement).

The Government does not allege the Defendants failed to maintain records of non-serious adverse events as required under 21 U.S.C. 379aa-1(e)(1).  Indeed, the Government DOES NOT allege that these records were not available for inspection during the Government's execution of its search warrants. All the emails from the customer center, which were mirror imaged by the Government from Blackstone's computers during the search warrant, were turned over in the millions of pages of discovery.  Rather, the Government attempts to broaden the reporting

10

requirements of Blackstone in the exact manner that was criticized by the Senate Committee Report above on DSNPA.

Because the Government has not alleged, and by all appearances cannot allege, that these complaining customers suffered serious adverse events as defined by the DSNPA, Defendants were not legally obligated to report these complaints to FDA.  In fact, as stated in the Committee Report, the FDA DOES NOT want dietary supplement companies to report nonserious adverse events, such as the stomach cramps allegedly experienced by T.L. Therefore, any evidence of the failure to report is irrelevant, unfairly and irreparably prejudicial, and an improper attempt to introduce "other bad acts."

This Court has the discretion to control the ever-expanding scope of this case.  Federal Rule of Evidence 102 provides:

These rules should be construed so as to, administer every proceeding fairly, eliminate unjustifiable expense and delay, and promote the development of evidence law, to the end of ascertaining the truth and securing a just determination.

Federal Rule of Evidence 401 defines evidence as relevant if (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is *of consequence* in determining the action.  (Emphasis added).  Federal Rule of Evidence 403 empowers the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time or needlessly presenting cumulative evidence." The United States Supreme Court has noted that "unfair prejudice" speaks to the capacity of some concededly relevant evidence to lure the factfinder into deciding guilt on a ground different from proof specific to the offense charged.  *See Old Chief v. United States*, 519 U.S.

11

172, 180 (1997).

Courts assess admissibility of other bad act evidence under Federal Rule of Evidence 404 using a three-part test: (1) the evidence must be relevant to an issue other than a defendant's character; (2) there must be sufficient proof so that a jury could find the defendant committed the extrinsic act; and (3) the evidence must possess probative value that is not substantially outweighed by its undue prejudice. *United States v. Jernigan*, 341 F.3d 1273 (11th Cir. 2003). Indictments and evidence should not make the jury cognizant of any prior bad acts beyond those necessary as an element of the offense charged. *United States v. Wilson*, 922 F.2d 1336 (7th Cir. 1991); *United States v. King*, 897 F.2d 911 (7th Cir. 1990).

Other bad act evidence can be inextricably intertwined with the charged offenses. Thus, evidence can be intrinsic and not extrinsic evidence subject to the requirements of Rule 404. Also Rule 404(b) allows for the introduction of extrinsic evidence if the evidence is offered for a purpose other than providing criminal propensity, for example, to provide evidence of motive, intent or lack of mistake or accident.

Defendants anticipate the response from the Government that other customer complaints are intrinsic because the complaints are inextricably "linked in time and circumstances with the charged crime and concerns the context, motive or setup of the crime; or forms an integral part of the crime, or is necessary to complete the story of the crime." *United States v. Sanders*, 663 F. App'x 781, 782 (11th Circuit 2016). Extrinsic evidence may be admissible for other purposes, if the evidence is offered for a purpose other than providing criminal propensity. *Id.* Rule 404(b) permits the admission of prior bad acts evidence to show, motive, preparation, knowledge, and intent, as well as an ongoing scheme or plan. *United States v. Perez*, 443 F.3d 772, 779 (11th Cir. 2006).

12

However, in this case, the Government has charged a scheme to defraud impeding the function of the FDA.  Uncharged customer complaints that were not required to be reported to the FDA are irrelevant to the charged crime.  They are not "bad acts," and therefore, are not extrinsic or intrinsic.

Furthermore, examples of the witness testimony above on pages 6 and 7 do not fit any of the exceptions.  They do not show motive, intent, knowledge, or ongoing scheme or plan relating to the charged offenses.  The evidence at issue here is only offered to the jury to infer bad character of the Defendants and to prop up C.H.  Evidence regarding the complaining customers is devoid of stand-alone probative value as to the underlying offenses charged in Count 1 of the Indictment.  The risk of prejudice is readily apparent.

The individual Defendants are entrepreneurs who engaged in the successful fitness and nutraceutical supplements industry.  Their email communications in some instances are not sophisticated.  Introducing the emails of complaining consumers and the responses would increase the risk that the jury would engage in judging Defendants' character rather than the Government's evidence.  There is also a significant danger that the jury may conclude that, if other customers have experienced a reaction to a Blackstone product, then a Blackstone product must be the cause of injury to C.H.  This would be prejudicial spillover of evidence from Count 1 to an element alleged in Count 4.  The regulatory requirement relating to "**serious adverse event**" explained above is completely different from the allegation in Count 4 that "**serious bodily injury**" resulted to C.H. from the use of "methyl-1-etiocholenolol."  Jury confusion is a real risk.

The Eleventh Circuit reviews rulings on prior bad act evidence for abuse of discretion.  *See United States v. Cooper,* 926 F.3d 718, 733 (11th Cir. 2019).  This Court also has the

13

discretion to limit evidence causing unjustifiable expense and delay.   This case is already estimated to last 5 weeks.

In summary, the Government has expressed an intent to call numerous other complaining customers, not identified as victims in the Indictment, whose complaints to Blackstone, regardless of what they may have told the agents later, did not trigger a legal obligation under the DSNPA for Blackstone to report their complaints to the FDA.   The Court should therefore exclude the witnesses and their complaints, prohibit the Government from making any reference or argument about the complaining customers during any stage of the trial, and direct the Government to notify all of its attorneys and witnesses of this limitation.

The witness R.R. reported to Blackstone that he was hospitalized.   The government produced meager medical records pertaining to R.R.   However, these records are materially incomplete.   The Government has contact with R.R. based on Production 18, which provided a receipt R.R. apparently just recently found in December 2020.   The Government can readily obtain R.R.'s medical waiver forms and obtain a full set of medical records spanning the period of at least 6 months before his complaint to 6 months after his complaint. It has not done so or has not produced that documentation to the defense. R.R.'s hospitalization may have been caused by something else entirely unrelated to Blackstone.   The burden is on the Government to provide complete medical records under its *Brady/Giglio* obligations.

Similarly, the government has included in the Indictment an allegation of an email concerning a complaint from another unidentified person, which Defendants believe is an email from a customer S.L., that contained information about an endoscopy after taking a product Angel Dust. Some medical records were provided.   The argument is the same as the one made above relating to R.R. Because of the spillover effect which could bolster or confuse the jury

14

about the enhancement naming C.H., the Defendants must have complete medical records spanning 6 months before her complaint to 6 months after her complaint in order to cross-examine S.L.   This applies to any other witnesses the Government offers. These complete medical records must be provided pursuant to the Government's *Brady* and *Giglio* obligations as set forth in the Standing Discovery Order.

### B. Motion to Strike Surplusage

Federal Rule of Criminal Procedure 7 governs Indictments and Informations.  Rule 7(d) provides that, "[u]pon the defendant's motion, the court may strike surplusage from the Indictment or Information.  The Advisory Committee Note to Rule 7 explains:

> **Note to Subdivision (d)**.  This Rule introduces a means of protecting the defendant against immaterial or irrelevant allegations in an indictment or information, which may, however be prejudicial.

Motions to strike surplusage are admittedly not favored.  *See*, *e.g.*, *United States v. Awan,* 966 F.2d 1415, 1426 (11th Cir. 1992) (Rule 7(d) sets a "most exacting standard").  But, as noted in the seminal treatise on the Federal Rules of Criminal Procedure (a treatise that was in fact cited by the Eleventh Circuit in *Awan*):

> Prosecutors have been known to insert unnecessary allegations for "color" or "background" hoping that these will stimulate the interest of the jurors.   The proper course for the defense is to *move to strike the surplusage* rather than to dismiss the indictment.

1 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 128 (4th ed. Supp. Oct. 2020) (emphasis added) (footnotes omitted).

"[T]he court may strike surplusage from the indictment or information when it is both irrelevant (or immaterial) and prejudicial."  *United States v. Hedgepeth*, 434 F.3d 609, 612 (3d Cir. 2006).  In *United States v. Zabawa*, 39 F.3d 279, 285 (10th Cir. 1994), a mail and wire fraud

telemarketing prosecution, the Tenth Circuit wrote:

> We review for abuse of discretion the district court's order striking paragraph 22 of the indictment as inflammatory and prejudicial. *United States v. Collins,* 920 F.2d 619, 631 (10th Cir.1990), *cert. denied,* 500 U.S. 920, 111 S.Ct. 2022, 114 L.Ed.2d 108 (1991). Fed.R.Crim.P. 7(d) allows district courts to strike "surplusage from the indictment or information." Use of Rule 7(d) is appropriate when the allegation is not relevant, or is inflammatory or prejudicial. *Collins,* 920 F.2d at 631. We must decide whether the language of paragraph 22 is an essential element of the alleged crimes.
>
> Although the government now argues that the reference to 6,708 victims illustrates the size and scope of the fraudulent schemes charged in counts 1–60, and is relevant, we note that it did not object or otherwise respond to the motion to strike paragraph 22. That paragraph is part of a multi-defendant indictment involving individuals with varying degrees of responsibility in perpetuating the fraud and is not an integral part of the indictment as a whole. The government identified thirty victims in the indictment and can establish all of the elements of the charged crimes without proving the scheme had 6,708 victims. We hold that the district court did not abuse its discretion in striking paragraph 22 of the indictment.

Defendants are asking to strike only those portions of the Indictment that mention customer complaints.  Specifically:

*Paragraph 7, page 9*.  "Among other things, BLACKSTONE disregarded complaints from consumers who reported getting ill or injured from BLACKSTONE's products. BLACKSTONE failed to notify the FDA of such complaints, even when required by law."

The first sentence, "Among other things, BLACKSTONE disregarded complaints from consumers who reported getting ill or injured from BLACKSTONE'S products," must be stricken as surplusage because BLACKSTONE had no legal obligation to report such complaints.  The Indictment should properly read, "BLACKSTONE failed to notify the FDA of consumer complaints, even when required by law.  With respect to R.R. who reported to Blackstone that he was hospitalized, more medical records are necessary for the Defendants to defend against R.R.

16

*Paragraph 11, page 12*.  "On or about March 19, 2015, a BLACKSTONE employee forwarded to AARON SINGERMAN a customer's email seeking help because BLACKSTONE's product Angel Dust caused her stomach pain and vomiting that required emergency medical attention."

It appears from the Government's correspondence dated January 14, 2021, in response to Defendants' inquiry that this Paragraph refers to S.L.'s email on March 18, 2015.  Again, if she is allowed to testify about her alleged experience with Angel Dust, based on this allegation in the Indictment, the Defendants need her complete medical records to show the jury that any alleged injury requiring an endoscopy, which does not meet the statutory definition of "serious adverse event," may not have been caused by a Blackstone product and is entirely different from the allegation about C.H.  The Court should strike Paragraph 11, page 12.

*Paragraph 36, page 16*.  "On or about January 28, 2017, PHILLIP BRAUN, in an email to a BLACKSTONE employee who was considering how to respond to a customer complaint, wrote, 'I'm not worried about losing the customer. Im [sic] concerned with her making it public.'"

Defendants believe this email exchange concerns S.N. complaining about an irregular heartbeat.  An email exchange with another employee at Blackstone was inadvertently sent to S.N. and S.N. took great offense.   BRAUN was concerned with the word choice in the response to the customer going public, not the allegation of an irregular heartbeat.  This is another complaint that was not required to be reported.  This paragraph must be stricken.  The paragraph does not allege that BRAUN had a legal obligation to report the email exchange to the FDA.  The allegation would mislead the jury.  There are no medical records provided by the Government. Angel Dust is a completely different product than any taken by C.H.  If not

stricken, medical records are necessary to permit the Defendants' medical expert to evaluate this evidence for the jury.

In short, the motion to strike goes hand-in-hand with the motion to exclude.  The customer complaints to Blackstone did not involve "serious adverse events" that were required to be reported to the FDA.  They are not relevant to prove any conspiracy to deceive or obstruct the FDA. They may not be used to improperly bolster the claims regarding C.H. and therefore they should be excised from both the Indictment and the trial.

**CONCLUSION**

Evidence concerning customer complaints is both irrelevant to the charged offenses and likely to create undue prejudice against Defendants.  For that reason and the others stated herein, such evidence should be excluded from the trial.  For the same reasons, any mention of customer complaints should be stricken from the Indictment.

WHEREFORE, the Defendants respectfully request that the Court grant their Motion in Limine by 1) excluding complaining customers, as described above, 2) excluding emails and other documents relating to any such complaints, and 3) striking those identified portions of the Indictment that refer to customer complaints.

**CONSULTATION WITH OPPOSING COUNSEL (LOCAL RULE 88.9(a)**

Undersigned counsel provided a draft of this Motion on July 28, 2021, to the Government's attorneys, Alistair Reader, Trial Attorney, Stephen Gripkey, Trial Attorney, John Burke, Assistant Director, and David Frank, Senior Litigation Counsel, Consumer Protection Branch, United States Department of Justice.  The Government has responded that they object to

18

the relief sought in this Motion.

DATED: AUGUST 2, 2021.

                                      Respectfully submitted,

NANCY VORPE QUINLAN
Of Counsel
PERLET & SHINER, P.A.
Counsel For Anthony Ventrella
Northbridge Centre
515 North Flagler Drive, Suite 701
West Palm Beach, Florida 33401
(561) 721-0552 telephone
(561) 721-3049 facsimile
By: *s/Nancy Vorpe Quinlan*
Nancy Vorpe Quinlan, Esq.
Florida Bar No. 0593532
Nquinlan@palmbeachdefense.com

RICHARD G. LUBIN, P.A.
707 North Flagler Drive
West Palm Beach, FL  33401
Telephone:  561-655-2040
Facsimile:   561-655-2182
Email: rich@lubinlaw.com
Counsel for Aaron Singerman
By:    */s/ Richard G. Lubin*
RICHARD G. LUBIN
Fla. Bar No. 182249

*/s/ Amy Morse*
AMY MORSE, ESQ.
Morse & Morse, LLC
Of Counsel to Richard G. Lubin, P.A.
707 North Flagler Drive
West Palm Beach, FL 33401
T: (561) 651-4145;
F: (561) 655-2182
Email: amy@morselegal.com
FL Bar No.: 0388475
Counsel for Aaron Singerman

*s/Benedict P. Kuehne*
BENEDICT P. KUEHNE
Florida Bar No. 233293
KUEHNE DAVIS LAW, P.A.
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
ben.kuehne@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Phillip Braun

*s/Michael T. Davis*
MICHAEL T. DAVIS
Florida Bar No.: 63374
KUEHNE DAVIS LAW, P.A.
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
mdavis@kuehnelaw.com
efiling@kuehnelaw.com
Counsel for Blackstone Labs, LLC

*s/Susan Dmitrovsky*
SUSAN DMITROVSKY
Florida Bar No. 73296
KUEHNE DAVIS LAW, P.A.
100 S.E. 2nd St., Suite 3550
Miami, FL 33131-2154
Tel: 305-789-5989
Fax: 305-789-5987
susand@kuehnelaw.com
Counsel for Blackstone Labs, LLC

*/s/ Robert J. Buonauro*
ROBERT J. BUONUARO, B.C.S.
435 Canal Street, Suite 208
New Smyrna Beach, Fl 32168
Tel:  407-841-1940
Fax: 407-649-1936
Florida Bar No.  150756
robert@buonauro.com
Counsel for David Winsauer

20

*/s/ J. Stephen Salter*
J. STEPHEN SALTER
8975 Pompano Way
Gulf Shores, Al 36542
T: (205) 585-1776
umstakwit@aol.com
Counsel for James Boccuzzi


*/s/ Robert J. Shearin*
ROBERT J. SHEARIN
1700 South Federal Highway, Suite 501
Boca Raton, Fl 33432
T: (561) 706-7572
F: (561) 429-2987
R1shearin1@yahoo.com
Bar No.: 47759
Counsel for Ventech Labs, LLC


## <u>CERTIFICATE OF SERVICE</u>

**I HEREBY CERTIFY** that on August 2, 2021, I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

*s/Nancy Vorpe Quinlan, Esquire*
Counsel for Anthony Ventrella

21